IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

PORTLAND DIVISION

| | |
|---|---|
| **RETAIL IMAGING MANAGEMENT GROUP, LLC**, an Oregon Limited Liability Company,<br><br>        Plaintiff,<br><br>v.<br><br>**FUJIFILM NORTH AMERICA CORPORATION**, a New York Corporation,<br><br>        Defendant. | Case No.: 3:11-cv-01242-SI<br><br><br>**OPINION AND ORDER** |

Gordon L. Osaka
Kelly A. Fisher
GORDON L. OSAKA, ATTORNEY AT LAW, P.C.
1000 S.W. Broadway, Ste. 940
Portland, OR 97205

    Of Attorneys for Plaintiff

Bruce H. Schneider
STROOCK & STROOCK & LAVAN LLP
180 Maiden Lane
New York, NY 10038

Philip S. Van Der Weele
K&L GATES LLP
222 SW Columbia St., Ste. 1400
Portland, OR 97201

    Of Attorneys for Defendant

**SIMON, District Judge.**

Retail Imaging Management Group, LLC ("RIMG") brings a federal antitrust lawsuit against its competitor and supplier, Fujifilm North America Corporation ("FUJI"), alleging unlawful monopolization and attempted monopolization in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2. RIMG also asserts claims of negligence and intentional interference with economic relations and contract. Before the court is Plaintiff's Motion for Temporary Restraining Order Without Notice; Alternatively, Motion for Preliminary Injunction With Notice (Doc. 36). For the following reasons, Plaintiff's motion and alternative motion are DENIED.

## I. MOTION FOR TRO WITHOUT NOTICE

On January 17, 2012, RIMG requested a Temporary Restraining Order Without Notice against FUJI. RIMG asked the court to enjoin FUJI from performing a business contract that FUJI recently entered into with a third party, Rite Aid. RIMG alleges that it had been providing certain services to Rite Aid for several years, but will now lose substantial income, and may even go out of business, if FUJI, rather than RIMG, is allowed to perform those services for Rite Aid.

A court may issue a temporary restraining order *without notice* to the adverse party only if "specific facts in an affidavit or a verified complaint clearly show that immediate and irreparable injury, loss, or damage will result to the movant *before the adverse party can be heard in opposition.*" Fed. R. Civ. P. 65(b)(1)(A) (emphasis added). A temporary restraining order without notice is generally granted only when providing notice to the adverse party would jeopardize the objective of the injunction. Plaintiff's declarations, testimony, and unverified complaint[1] do not show that immediate and irreparable injury, loss, or damage would result to

---

[1] Although Plaintiff's motion and memorandum each recite that it was supported by a "verified Second Amended Complaint," the complaints filed in this matter were not, in fact, "verified."

the movant "before the adverse party can be heard in opposition." Accordingly, Plaintiff's motion for a temporary restraining order without notice is DENIED.

## II. ALTERNATIVE MOTION FOR PRELIMINARY INJUNCTION

### A.  Standard

A preliminary injunction is an "extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter v. Natural Resources Defense Council,* 555 U.S. 7, 22 (2008). A plaintiff seeking a preliminary injunction must show: (1) that he is likely to succeed on the merits; (2) that he is likely to suffer irreparable harm in the absence of preliminary relief; (3) that the balance of equities tips in his favor; and (4) that an injunction is in the public interest. *Winter,* 555 U.S. at 20 (rejecting the Ninth Circuit's earlier rule that the mere "possibility" of irreparable harm, as opposed to its likelihood, was sufficient, in some circumstances, to justify a preliminary injunction).

The Supreme Court's decision in *Winter,* however, did not disturb the Ninth Circuit's alternative "serious questions" test. *Alliance for the Wild Rockies v. Cottrell,* 632 F.3d 1127, 1131-32 (9th Cir. 2011) ("'serious questions going to the merits' and a hardship balance that tips sharply toward the plaintiff can support issuance of an injunction, assuming the other two elements of the *Winter* test are also met"). Thus, a preliminary injunction may be granted "if there is a likelihood of irreparable injury to the plaintiff; there are serious questions going to the merits; the balance of hardships tips sharply in favor of the plaintiff; and the injunction is in the public interest") *M.R. v. Dreyfus,* 663 F.3d 1100, 1108 (9th Cir. 2011) (citing *Alliance*).[2]

---

[2] The federal antitrust laws allow injunctive relief for private parties, including preliminary injunctive relief. Clayton Act, § 16, 15 U.S.C. § 26 ("Any person, firm, corporation, or association shall be entitled to sue for and have injunctive relief . . . against threatened loss or damages by a violation of the antitrust laws . . . when and under the same conditions and principles as injunctive relief against threatened conduct that will cause loss or damage is granted

Page 3 – OPINION AND ORDER

B.  **Factual Background**

Plaintiff's alternative motion for preliminary injunction was heard by the court with an evidentiary hearing held on January 19, 2012. The following factual background is derived from the evidence received and the allegations stated in the Second Amended Complaint.

A "minilab" is a self-contained machine that converts images, stored either digitally or on film, into finished photographs or other similar products. Defendant, FUJI, manufactures minilabs and sells or leases them in competition with minilabs made by other manufacturers. FUJI also offers minilab repair service to retail users who purchase or lease FUJI-brand minilabs. In addition, FUJI sells, or has sold, replacement parts to independent service organizations ("ISOs") that provide repair service for FUJI-brand minilabs. FUJI also provides, or has provided, technical support to such ISOs. Thus, FUJI both competes with ISOs for the provision of repair service for FUJI-brand minilabs and also supplies, or has supplied, ISOs with replacement parts and other technical support used by ISOs in their repair service business.

Plaintiff, RIMG, began business in 2000. RIMG provides repair service for FUJI-brand minilabs to retail users throughout the U.S in competition with FUJI. RIMG also services minilabs made by other manufacturers. RIMG alleges that it is the only ISO that competes with FUJI on a nationwide basis for repair service of FUJI-brand minilabs. RIMG also alleges that FUJI maintains at least a 70 percent share in what RIMG alleges to be a relevant nationwide market of repair service for FUJI-brand minilabs.

From 2001 through 2010, RIMG developed a business relationship and course of conduct with FUJI under which FUJI provided RIMG with access to FUJI-brand minilab replacement

---

by courts of equity, under the rules governing such proceedings, and upon the execution of proper bond against damages for an injunction improvidently granted and a showing that the danger of irreparable loss or damage is immediate, a preliminary injunction may issue.").

parts and other resources necessary for RIMG to service FUJI-brand minilabs. The business relationship between RIMG and FUJI began with "a handshake." Beginning in 2005 and ending in August 2010, RIMG and FUJI entered into several written contracts. Under these contracts, FUJI provided parts and other resources necessary for RIMG to service FUJI-brand minilabs.

RIMG alleges that in 2006, FUJI acquired a 30 percent ownership interest in CES. Before 2006, CES was not a competitor in the servicing of FUJI-brand minilabs. After the acquisition of this 30 percent interest, RIMG alleges, FUJI terminated its own field service personnel used to service minilabs and other FUJI-brand machines. CES hired many former-FUJI personnel, and FUJI then outsourced its retail user minilab service work to CES, according to RIMG. FUJI directed work to CES for FUJI customers on warranty and other service work.

According to RIMG, the FUJI-CES relationship initially had no effect on the FUJI-RIMG relationship. The FUJI-RIMG service agreements were renewed for two successive two-year terms, then for a one-year term, and remained in effect until August 2010, when the then-current agreement expired. Under these written contracts, FUJI provided RIMG with parts and other resources that RIMG needed to service FUJI-brand minilab machines.

In 2006, Noritsu, a FUJI competitor in the manufacture of minilabs, worked with FUJI jointly to develop a digital mini dry lab. This product was introduced into the U.S. market in 2008 as the FUJI DL400 series mini dry lab. FUJI continued to provide RIMG with needed parts and other resources necessary for RIMG to service FUJI-brand mini-labs, including the new mini dry lab, the DL400.

According to RIMG, its reputation as a national service company grew, and RIMG became a competitive threat to FUJI minilab service on a nationwide level. In 2009, Sam's Club (a subsidiary of Walmart) approached RIMG about bidding for its photo finishing equipment

service contract, the bulk of which included FUJI-brand minilabs that were then being serviced by FUJI. That led to a contract between RIMG and Sam's Club for certain Sam's Club locations beginning in April 2010, with RIMG taking over from FUJI the servicing of all Sam's Club locations by late 2010.

RIMG alleges that FUJI was unhappy with RIMG's competitive success in the national market for servicing FUJI-brand minilabs and, as a result, FUJI became less cooperative with RIMG. In August 2010, the FUJI-RIMG contract came to an end and was not renewed by FUJI. According to RIMG, FUJI then started withholding from RIMG a "jig kit" that is necessary for RIMG to use in the repair of defective print heads in FUJI's DL400 series minilabs. Without this jig kit, RIMG was forced to sub-contract with, or retain, FUJI to repair defective print heads for RIMG's service customers at a cost to RIMG of approximately $16,000 per print head replacement. FUJI has sent invoices to RIMG for this work, which total more than $500,000. RIMG alleges that when a FUJI service customer requires the replacement of a defective print head, FUJI provides the replacement print head and service without charge.

In October 2011, FUJI took over Rite Aid's "bench work" from RIMG.[3] RIMG alleges that FUJI is performing this work for Rite Aid below FUJI's average variable cost. RIMG also alleges that the loss of the Rite Aid revenue from RIMG's bench work will adversely affect RIMG's cash flow and, hence, its ability to compete with FUJI for FUJI-brand minilab service.

RIMG also alleges that on January 16, 2012, FUJI began the process of taking away from RIMG the photo call center support (also known as "telephone help desk support") for all 4,400 Rite Aid locations nationwide. RIMG's chief executive officer Brad Eamon states that this loss of business will cause RIMG to lose "in excess of 30% of total sales" and cause most of RIMG's

---

[3] "Bench work" is minilab repair work performed off-site from a service customer's location.

100 Portland-based employees "to lose their jobs on March 1, 2012," if FUJI is allowed to take over the photo call center service business for Rite Aid. Declaration of Brad Eamon in Support of Plaintiff's Motion for Temporary Restraining Order.

RIMG contends that FUJI has the intent to suppress RIMG as a service competitor by raising RIMG's costs of operations, crippling or destroying RIMG's reputation and goodwill, and financially handicapping RIMG's ability to compete with FUJI in the FUJI-brand minilab service market. Based on these allegations, RIMG asserts, among other claims, that FUJI has monopolized or attempted to monopolize the nationwide market for FUJI-brand minilab repair service.[4] In its motion for preliminary injunctive relief, RIMG seeks to enjoin FUJI from performing under its recently-negotiated minilab repair service contract with Rite Aid.

C.   **Discussion**

   1.   Likelihood of irreparable injury

"Typically, monetary harm does not constitute irreparable harm." *California Pharmacists Association v. Maxwell-Jolly,* 563 F.3d 847, 851 (9th Cir. 2009); *see also Goldie's Bookstore, Inc. v. Superior Court,* 739 F.2d 466, 471 (9th Cir. 1984) ("Mere financial injury, however, will not constitute irreparable harm if adequate compensatory relief will be available in the course of litigation."). RIMG argues, however, that its "[l]oss of revenue and people losing their jobs satisfies the irreparable harm test," *citing SAC and Fox Nation of Missouri v. LaFaver,* 905 F. Supp. 904 (D. Kan. 1995). Plaintiff's Memorandum at 12.

In addition, during the evidentiary hearing RIMG referred the court to *Foremost International Tours, Inc. v. Qantas Airways, Ltd.,* 379 F. Supp. 88 (D. Haw. 1974), *aff'd* 525

---

[4] It is unclear from the pleadings whether RIMG alleges that "bench work" and "photo call center" services are part of the defined market for FUJI-brand minilab repair service or whether they are separate relevant markets or sub-markets.

Page 7 – OPINION AND ORDER

F.2d 281 (9th Cir. 1975), for the proposition that putting a company out of business may be sufficient to warrant a preliminary injunction. In *Foremost,* the district court noted:

> Courts should be particularly concerned with threats to the existence of a moving party's business in the area of antitrust. An award of only money damages in lieu of preserving a competitor disserves the public interest.

*Foremost,* 379 F. Supp. at 97.

FUJI responds by citing the case of *Dollar Rent A Car of Washington, Inc. v. Travelers Indem. Co.,* 774 F.2d 1371, 1375 (9th Cir. 1985), which FUJI says supports the conclusion that "an assertion that a moving party would go out of business in the absence of a preliminary injunction is insufficient to show irreparable injury." Defendant's Memorandum at 8. Both sides overstate their legal authorities.

In *SAC and Fox Nation of Missouri,* the district court in Kansas issued a temporary restraining order that challenged the imposition of a motor fuel tax by the Kansas Department of Revenue on sales of gasoline diesel fuel sold on Native American lands. The court found irreparable injury in the fact that the "loss of revenue will result in decreased services and programs to Tribal members and the loss of employment for specific Tribal members" and noted that "such basic services as law enforcement and fire protection may be endangered by this loss of revenue." *SAC and Fox Nation,* 905 F. Supp. at 907. The Tribes also argued that "the loss of revenue in the interim may so devastate the Tribes that the ability to sustain themselves may be irretrievably lost." *Id.* In light of this, the court concluded that "[u]nder normal circumstances, monetary loss may be remedied by an award of compensatory damages, and the risk of such loss is therefore not considered irreparable. . . . Here, however, the court considers the consequences of such losses as extremely serious and potentially devastating to the Tribes. Such loss would

indeed meet the irreparable harm test." *Id.* (citation omitted). RIMG's claimed potential losses, while quite serious, do not appear to rise to this level of widespread devastation.

With regard to *Foremost*, as FUJI correctly points out in its post-hearing supplemental memorandum, the district court in that case reviewed a year-to-year financial comparison for three months, April, May, and June 1973 versus 1974, and found that the plaintiff had lost 67%, 89%, and 95% of its monthly business, respectively. *Foremost*, 379 F. Supp. at 92; *see also* Defendant's Post-Hearing Supplemental Memorandum at 3 n. 2. This is far greater than RIMG's claimed anticipated loss of 30% of its business resulting from Rite Aid's decision to contract with FUJI rather than with RIMG.[5]

On the other hand, the Ninth Circuit decision in *Dollar Rent A Car* left open the possibility that, under some circumstances, the irreparable damage requirement may be satisfied with the threatened destruction of a business. In that case, the Ninth Circuit wrote:

> Viking argued to the district court that it would suffer irreparable injury because all of its income is derived from the Travelers-Dollar program and, in the absence of the preliminary injunction, Viking would go out of business. In support thereof, Viking relies upon *Janmort Leasing, Inc. v. Econo-Car International, Inc.,* 475 F. Supp. 1282, 1294 (E.D.N.Y. 1979). In *Janmort,* however, the ongoing business that was threatened with destruction was an operating car franchise with offices, employees, cars on the road, etc. Viking, on the other hand, is a subsidiary of Dollar located in the Caribbean. No showing was made of the number of Viking employees, its existing good will, or its commitments other than those incurred by the Reinsurance Agreements.

---

[5] In the present case, the court is appropriately sensitive to the loss of any jobs by RIMG's employees in Oregon, but an inappropriately granted preliminary injunction may wrongfully cause a comparable loss of jobs to FUJI's employees in another state in this nationwide market. Under constitutional law principles derived from the "dormant commerce clause" doctrine, a court should not prefer the jobs of employees in one state over the jobs of employees in another state. *See generally* Erwin Chemerinsky, CONSTITUTIONAL LAW: PRINCIPLES AND POLICIES 430-461 (4th ed. 2011).

Page 9 – OPINION AND ORDER

*Dollar Rent A Car,* 774 F.2d at 1375; *see also Hughes Network Systems, Inc. v. Interdigital Communications Corp.,* 17 F.3d 691, 694 (4th Cir. 1994) (in remanding for further consideration, court noted that even if loss can be compensated by money damages, extraordinary circumstances may give rise to irreparable harm required for preliminary injunction); *but see Instant Air Freight Co. v. C.F. Air Freight, Inc.,* 882 F.2d 797, 801-802 (3d Cir. 1989) (harm was not deemed irreparable even though nature of action involved loss of majority of business revenue).

In conclusion, the threatened destruction of a business may, under certain circumstances, be sufficient to satisfy the requirement that a movant show a "likelihood of irreparable injury." The evidence that RIMG has presented, however, does not show a likelihood of irreparable injury. Moreover, for the reasons that follow, RIMG's evidence also does not satisfy its burden of establishing the other requirements needed for a preliminary injunction.

    2,    <u>Serious questions going to the merits</u>

As stated above, in the Ninth Circuit a party seeking a preliminary injunction need not show a likelihood of success on the merits so long as that party can show "'serious questions going to the merits' and a hardship balance that tips sharply toward the plaintiff," assuming that the other two elements (likelihood of irreparable injury and the public interest favors an injunction) are satisfied. *Alliance,* 632 F.3d at 1131-32. The Ninth Circuit has also said that, as an "'irreducible minimum,' the moving party must demonstrate a fair chance of success on the merits, or questions serious enough to require litigation." *Arcamuzi v. Continental Air Lines, Inc.,* 819 F.2d 935, 937 (9th Cir. 1987).

The gravamen of RIMG's antitrust claim, as stated in its Second Amended Complaint, is that FUJI has willfully maintained (or has attempted to obtain and has come dangerously close to

obtaining) "monopoly power in the FUJI-brand minilab service market through exclusionary and anticompetitive conduct." Sec. Am. Comp., ¶ 75. RIMG asserts that FUJI has a continuing duty "to make available to RIMG under reasonable terms all replacement parts and necessary tools and resources in accordance with FUJI's continuing course of conduct." Sec. Am. Comp., ¶ 57. RIMG's motion for a preliminary injunction, however, does not seek an order requiring FUJI to continue to make such parts, tools, and resources available to RIMG, pending a final decision on the merits.

RIMG also alleges that "FUJI sells the replacement print heads at a much higher price than when they are offered and sold as part of a bundle" and that when "FUJI offers the replacement print heads with FUJI/CES labor, the labor required to provide the installation is sold below the average variable cost incurred by FUJI to provide such labor." Sec. Am. Comp., ¶ 60. RIMG's motion for a preliminary injunction, however, does not seek an order requiring FUJI to "unbundle" its sales of replacement print heads and labor, pending a final decision on the merits.

RIMG further alleges price discrimination in the sale of print heads and claims that "FUJI favors certain end user customers by selling print heads below the average variable cost FUJI incurs." Sec. Am. Comp., ¶ 62. RIMG's motion for a preliminary injunction, however, does not seek an order prohibiting FUJI from selling print heads at discriminatory prices or below average variable cost, pending a final decision on the merits.

Instead, RIMG seeks a preliminary injunction to prohibit FUJI "from performing Rite Aid's Photo Call Center business." Plaintiff's Memorandum, at 2. That work, however, is not even mentioned in RIMG's Second Amended Complaint, and it is far from clear whether, and if so how, a photo call center business relates to the market for FUJI-brand minilab service, which

is the only market that RIMG alleges in its Second Amended Complaint that FUJI has monopolized or attempted to monopolize.[6]

During the January 19th evidentiary hearing, counsel for RIMG indicated that RIMG would soon be seeking leave to file a Third Amended Complaint. On January 26, 2012, RIMG filed an unopposed motion for leave to file a Third Amended Complaint, which the court allowed on January 27, 2012. In its recently amended pleading, RIMG continues to allege that FUJI possesses "monopoly power in the FUJI-brand minilab service market," Third Am. Comp., ¶ 77, which FUJI allegedly maintains through exclusionary or anticompetitive conduct. *Id.* at ¶ 78.

Also in its Third Amended Complaint, RIMG alleges that "FUJI solicited Rite Aid to include Rite Aid's Call Center Services work as part of a bundle of products and services FUJI would be providing, ultimately taking such work in phases beginning January 16, 2012." Third Am. Comp., ¶ 53. RIMG further alleges: "If the discounts, or other form of monetary or in kind allowance, given to Rite Aid on the bundled products and services were applied to the Call Center Services work, FUJI would be doing said work below its average variable cost." *Id.; see also* Third Am. Comp., ¶ 78(c) ("FUJI has engaged in exclusionary pricing of a bundle product"). This allegation would appear to connect RIMG's antitrust claim to its request for a preliminary injunction to prevent FUJI from commencing performance on its recently agreed-upon contract with Rite Aid. This allegation may also state an antitrust claim of unlawful bundling that is recognized in the Ninth Circuit. *See Cascade Health Solutions v. PeaceHealth*, 515 F.3d 883, 909-910 (9th Cir. 2008) (a bundled price is legal if, when the total discount is

---

[6] To the extent that they are separate markets and RIMG is attempting to allege a theory of "monopoly leveraging," that is not a valid antitrust theory in the Ninth Circuit. *See John Doe 1 v. Abbott Laboratories*, 571 F.3d 930, 934 (9th Cir. 2009).

attributed only to the product that less diversified competitors are trying to sell separately, the resulting price is above the seller's average variable costs for that product).[7]

Even if the court ignores, however, the unorthodox timing of RIMG's motion and pleadings (moving for a preliminary injunction first based on a theory that is not contained in the then-most current complaint and later moving to file a further amended complaint that attempts to link the substantive allegations to the preliminary relief requested), merely alleging a fact does not make it so. Neither in RIMG's declarations submitted in support of its motion for a preliminary injunction nor in its submissions at the evidentiary hearing did RIMG offer any admissible evidence tending to show that "FUJI has engaged in exclusionary pricing of a bundle product" by offering to perform call center service work below its average variable cost. In his declaration dated January 17, 2012, RIMG's chief executive officer Brad Eamon asserted: "In effect, FUJI offered Rite Aid a below-cost offer for the call center business that Rite Aid could not refuse." Mr. Eamon, however, offered no admissible evidence in support of this conclusion nor any explanation, again with admissible evidence, of how he would know his competitor's average variable cost structure. Moreover, FUJI's vice president of Field Operations, Steven N. Pagano, submitted a declaration in opposition to RIMG's motion for preliminary injunction, in which Mr. Pagano stated: "The anticipated revenues for Call Center Services exceeded the anticipated costs associated with the provision of those services and provided FUJI with a margin

---

[7] The court will wait for another day to evaluate the question of whether call center service is a "product that less diversified competitors are trying to sell separately," given that both RIMG and FUJI appear to be selling both repair services and call center services to the same customer. Thus, if RIMG offers both services in a bundle, under what circumstances, if any, should the antitrust laws, under *PeaceHealth*, restrict FUJI from doing so? There may be a good answer to that question, but that analysis is for another day.

Page 13 – OPINION AND ORDER

of profit."[8]  Given the current state of the factual record, the court cannot conclude that RIMG has met its burden of making a clear showing of "a fair chance of success on the merits, or questions serious enough to require litigation" on the issue of whether FUJI has engaged in unlawful, below-cost bundling in violation of the antitrust laws.

       3.     <u>The balance of hardships and the public interest</u>

At this stage of the litigation, only one fact appears to be reasonably well established: RIMG and FUJI are currently engaged in significant and vigorous competition with each other to provide various services (consisting of at least on-site minilab repair service, bench work service, and call center service) to businesses that lease or purchase FUJI-brand minilabs. As stated above, in 2010 RIMG took from FUJI the on-site repair service for Sam's Club locations nationwide. In 2011, FUJI took from RIMG the "bench work" business at Rite Aid. And in 2012, it appears that FUJI now may be taking from RIMG the call center service business for Rite Aid. Insufficient evidence has been presented to the court to determine whether this is anything more than simply the competitive forces of the marketplace at work.

In addition, RIMG asserts that FUJI has cut its prices in order to obtain Rite Aid's business for call center services. The Supreme Court, however, has said that "cutting prices in order to increase business often is the very essence of competition." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 594 (1986). Further, "[l]ow prices benefit consumers regardless of how those prices are set, and so long as they are above predatory levels, they do not threaten competition." *Atlantic Richfield Co., v. USA Petroleum Co.*, 495 U.S. 328, 340 (1990).

Moreover, it is well established that "[t]he antitrust laws . . . were enacted for 'the protection of competition, not competitors.'" *Brunswick v. Pueblo Bowl-O-Mat, Inc.*, 429

---

[8] Mr. Pagano, however, did not explain in his declaration whether he was referring to "average variable costs" or to some other measure of cost.

Page 14 – OPINION AND ORDER

U.S. 477, 488 (1977) (quoting *Brown Shoe Co. v. United States,* 370 U.S. 294, 320 (1962)). The Supreme Court has also stated that it should "resist interpretation geared more to the protection of existing *competitors* than to the stimulation of *competition*." *Volvo Trucks North America, Inc. v. Reeder-Simco GMC,* 546 U.S. 164, 168 (2006) (emphasis in original). Finally, "'false positive' mistaken inferences that chill the very conduct the antitrust laws are designed to protect" are especially costly. *Verizon Communications Inc. v. Law Offices of Curtis V. Trinko, LLP,* 540 U.S. 398, 399-400 (2004) (quoting *Matsushita,* 475 U.S. at 594).

On the basis of the evidence presented, the court cannot conclude that the public interest favors granting the preliminary injunction sought by RIMG. Moreover, the preliminary injunction, if granted, may result in FUJI being in breach its contract with Rite Aid.[9] Thus, the court also cannot conclude that the balance of hardships tips "sharply" in favor of RIMG. Accordingly, based on the evidence presented the court declines, at this preliminary stage of the litigation, to place the substantial power of the federal courts on the side of one competitor against another as they compete for business in the commercial marketplace.

### III. CONCLUSION

For the reasons stated above, Plaintiff's motion for temporary restraining order without notice and alternative motion for preliminary injunction (Doc. 36) are **DENIED**.

IT IS SO ORDERED.

Dated this 30th day of January, 2012.

/s/ Michael H. Simon
Michael H. Simon
United States District Judge

---

[9] In light of the court's ruling, there is no need to discuss the details of any security that would have been required had a preliminary injunction been ordered. *See* Fed. R. Civ. P. 65(c).

Page 15 – OPINION AND ORDER